# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| CAPGEMINI AMERICA, INC., | ) | |
| | ) | Case No. |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| INNERWORKINGS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Capgemini America, Inc. ("Capgemini" or "Plaintiff"), by the undersigned attorneys, as and for its Complaint in this action against defendant InnerWorkings, Inc. ("InnerWorkings" or "Defendant"), alleges as follows:

## Nature of this Action

1.     In this action, Capgemini seeks damages arising out of InnerWorkings' breach of certain business process outsourcing agreements between the parties. Capgemini has fully performed the requested services. Nevertheless, InnerWorkings has purported to terminate the subject agreements despite having no legal right to do so, and has refused to and/or repudiated its obligation to pay Capgemini. Accordingly, Capgemini has suffered damages of approximately $2,363,716.50.

## The Parties, Jurisdiction and Venue

2.     Capgemini is a corporation organized under the laws of New Jersey, with its principal place of business located at 623 Fifth Avenue, New York, NY 10022.

3.     Upon information and belief, defendant InnerWorkings is a corporation organized under the laws of Delaware, with its principal place of business located at 600 West

Chicago Avenue, Suite 850, Chicago, IL.

4.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332.

5.     The amount in controversy, exclusive of interest and costs, exceeds the sum of $75,000.

6.     This Court has personal jurisdiction and venue over InnerWorkings because InnerWorkings' principal place of business is in this District.  Further, § 10.11 of the Master Services Agreement between the parties (the "MSA", a true and correct copy of which is annexed hereto as Exhibit A) provides for exclusive jurisdiction in Illinois.

**<u>Facts Common To All Claims</u>**

A.     **<u>Background</u>**.

7.     Upon information and belief, InnerWorkings is a leading marketing execution firm servicing Fortune 500 brands across a wide range of industries. InnerWorkings employs approximately 1,700 individuals and maintains sixty-two global offices in thirty countries.

8.     In or about 2014, InnerWorkings began looking to outsource certain of its finance and accounting activities in a number of countries where it does business.

9.     In or about early February 2015, InnerWorkings selected Capgemini as its business process outsourcer.

B.     **<u>The MSA and SOW</u>**.

11.     The parties entered into the MSA dated as of February 2, 2015, which, <u>inter alia</u>, sets forth the general terms by which Capgemini would provide business processing outsourcing services to InnerWorkings, including pursuant to certain statements of work that may be entered into by the parties (MSA § 1.1).

12.     On or about February 2, 2015, Capgemini and InnerWorkings executed a statement of work (the "SOW", a true and correct copy of which is annexed hereto as Exhibit B). The SOW is governed by the MSA and sets forth the terms for Capgemini to perform certain services, including transitioning certain of InnerWorkings' finance and accounting activities over to Capgemini, and then for Capgemini to "run" InnerWorkings' finance and accounting activities, pursuant to the parties' rights and obligations as set forth in the MSA and SOW (collectively, the "Agreement").

13.     In particular, in the SOW, inter alia, InnerWorkings agreed to outsource, and Capgemini agreed to perform, for a term of five years, the following finance and accounting activities: (a) Procure to Pay, (b) Order to Cash, and (c) Record to Report.

14.     Although, as set forth above, Capgemini's transition services were to be performed, for the most part, over the first several months of the engagement, InnerWorkings requested that the charges for such transition services be amortized and spread out over approximately the first two years of the engagement, i.e., twenty-three months, through and including December 31, 2016.  As an accommodation to InnerWorkings, Capgemini agreed to do so, and InnerWorkings agreed to pay all incurred transition fees in full, regardless of any termination of the Agreement for any reason, whether for convenience or material breach (see SOW Schedule 4 § 14(b) and SOW Schedule 4A at pp. 3-6, true and correct copies of which are annexed hereto as Exhibits C and D).

15.     Capgemini successfully completed the transition in or about June 2015, and began to "run" the subject accounting and financial activities in or about July 2015, pursuant to the terms of the Agreement.

16.     Capgemini billed InnerWorkings as set forth in the Agreement.   In

particular, the MSA provides for Capgemini to invoice InnerWorkings at the beginning of each month, with payment due within 30 days after the date InnerWorkings receives the invoice (MSA § 3.2).

17.     Further, SOW Schedule 4A specifically sets forth the amounts to be billed each month, including for amortized charges for the transition services provided in 2015, and in advance for "run" charges to be performed that month (see generally SOW Schedule 14A). Through December 2015, InnerWorkings paid the transition and "run" invoices without dispute, issue or protest.

**C.      InnerWorkings Wrongfully Purports To Terminate The Agreement.**

18.     In or about mid-December 2015, after Capgemini had successfully transitioned over InnerWorkings' accounting and financial functions, InnerWorkings had "signed-off" and approved the transition, and Capgemini was successfully "running" Innerworkings' accounting and financial activities, InnerWorkings began to manufacture issues, and/or improperly characterize normal operational issues as material ones, to attempt to extricate itself from the Agreement, presumably to avoid paying fees owed to Capgemini.

19.     As set forth above, the Agreement is for a five year term.  Although InnerWorkings has a right to terminate for convenience, the MSA provides that InnerWorkings may not do so until an effective date of October 1, 2016 (MSA §§ 4.1 and 4.3).  Further, upon termination for convenience, InnerWorkings is required to pay all amounts due (MSA § 4.3), including but not limited to all amortized transition charges, as well as the termination charges as of October 1, 2016 (see SOW Schedule 4 § 14(a)); SOW Schedule 4A at pp. 3-6 and 24).

20.     In a transparent effort to avoid such charges, InnerWorkings began to concoct grounds for purported termination.   However, although the Agreement may be

terminated for breach, such breach must be material, and InnerWorkings must first provide written notice, a description of the material breach, and a thirty day opportunity to cure. (See MSA § 4.2(a) (party may only terminate for material breach "[i]f a Party breaches any material term of this Agreement and fails to cure such breach within 30 days after the non-breaching party provides written notice of such failure together with a description of such breach" (emphasis added))).

21.     As more fully set forth below, InnerWorkings has failed to demonstrate a material breach -- as none exists. Further, InnerWorkings failed to provide the contractually required written notice, description of breach, and/or a thirty day opportunity to cure.

22.     In particular, during a meeting on or about December 9, 2015, InnerWorkings, for the first time, verbally reported discontent with some Capgemini associates working on the engagement. After Capgemini pressed for details from InnerWorkings so it could investigate any purported issues and, if necessary, address such concerns, InnerWorkings singled out only three Capgemini associates, out of a team of approximately forty.

23.     Within a few days of the meeting, on or about December 15, 2015, Capgemini attempted to present InnerWorkings with a plan to investigate and, if necessary, address InnerWorkings' purported concerns. However, on or about that same day, InnerWorkings told Capgemini not to bother with Capgemini's plan to investigate (and, if necessary, remediate) because InnerWorkings was terminating the Agreement for material breach in any event.

24.     As set forth above and below, InnerWorkings had and has no grounds to terminate for material breach. The Capgemini associates on the engagement were and are qualified, and performed the services as required under the Agreement. Further, such services

were accepted and, through at least December 2015, paid for by InnerWorkings. Moreover, even though the experience, qualifications and performance of the associates singled out by InnerWorkings were appropriate, Capgemini, as an accommodation to InnerWorkings, replaced associates, added additional staff, and/or otherwise addressed any purported issues by no later than January 8, 2016, thereby curing any purported breach.

25. In any event, the verbal discussions described above do not constitute the contractually required written notice of material breach under MSA § 4.2. Further, InnerWorkings did not provide a thirty day opportunity to cure -- InnerWorkings advised Capgemini it would be terminating for material breach only a few days after raising the subject issues (which were in any event cured).

26. Indeed, InnerWorkings does not even appear to claim that the verbal discussions in December 2015 constitute the contractually required written notice and opportunity to cure.

27. Rather, InnerWorkings is apparently relying on a letter to Capgemini sent by email on January 11, 2016 but dated January 8, 2016 (the "January 8 Letter", a true and correct copy of which, with transmittal email, is annexed hereto as Exhibit E). The January 8 Letter states, inter alia, that "[w]e hereby provide written notice pursuant to [MSA] Section 4.2(a) of the following material breaches". In the January 8 Letter, InnerWorkings claims, in conclusory fashion, that (i) "persons assigned by Capgemini to perform the services (the 'Assigned Personnel') do not have appropriate technical and professional skills and experience", and (ii) "the services have not been performed in a good work-manlike manner" (see Exhibit E).

28. The January 8 Letter clearly does not constitute the notice and thirty day opportunity to cure required under MSA § 4.2(a). First of all, as set forth above, InnerWorkings

had already decided back on or about December 15, 2015 that it was terminating for material breach and advised Capgemini of such -- without providing any written notice or thirty day cure period.  Hence, the January 8 Letter does not provide an opportunity to cure, as InnerWorkings' decision to terminate for breach had already been made.

29.     Further, the January 8 Letter does not even purport to provide a 30 day cure period but is rather entitled *"Final* Notice of Grounds for Termination for Cause*"* (italics added; underline in original).

30.     Moreover, the MSA requires any written notice of material breach to contain a "description of such breach" (MSA § 4.2(a) (emphasis added)), with the obvious purpose being that the notice contain enough specificity so the alleged breaching party could learn specifically the nature of the purported breach so such party may reasonably attempt to cure same.  However, the January 8 Letter merely makes bald, conclusory assertions, and is therefore insufficient.

31.     Further, to the extent the allegations in the January 8 Letter relate to the three Capgemini associates who had been singled-out by InnerWorkings, Capgemini, as set forth above at paragraph 24, had already resolved any purported issue -- even though InnerWorkings' allegations were unfounded.  Hence, any purported breach was cured before the January 8 Letter was sent.

32.     Capgemini has repeatedly disputed InnerWorkings' purported termination of the Agreement and over several months attempted to resolve this matter amicably.  Nevertheless, InnerWorkings has purported to terminate the Agreement effective April 15, 2016, and has failed, refused and/or repudiated its obligation to make required payments to Capgemini (see Exhibits F and G hereto).

**D.**     **Damages Owed from InnerWorkings to Capgemini.**

33.     As a result of InnerWorkings' wrongful termination, anticipatory breach and/or repudiation of the Agreement, InnerWorkings owes Capgemini damages as set forth below.

34.     First, InnerWorkings has failed to pay at least two months of outstanding invoices, four invoices in total. In particular, on January 1, 2016, Capgemini submitted invoices to InnerWorkings in the amount of $210,400 for amortized transition services incurred in 2015 and $95,752.61 for run charges. On February 1, 2016, Capgemini submitted invoices to InnerWorkings in the amount of $53,529.84 for amortized transition services incurred in 2015 and $94,167.10 for run charges (collectively such four invoices, which total $453,849.55, are referred to herein as the "Outstanding Invoices").

35.     All such amounts invoiced are as specifically set forth in Schedule 4A to the SOW (less certain applicable credits) and, pursuant to MSA § 3.2, payable within thirty days of InnerWorkings' receipt of the invoice.

36.     Second, on or about March 1, 2016, Capgemini submitted invoices to InnerWorkings in the amount of $53,530 for amortized transition services incurred in 2015 and $95,753 for run charges, totaling $149,283 (the "March 2016 Invoices"). Such invoices are due and payable on March 31, 2016. InnerWorkings has apparently repudiated its obligation to pay such invoices (see Exhibits F and G).

37.     Third, on or about April 1, 2016, Capgemini will submit invoices to InnerWorkings through April 15, 2016 (the "April First-Half Invoices"), the date InnerWorkings has designated as the effective termination date (see Exhibit F). Charges for the first half of April are $26,765 for amortized transition services incurred in 2015 and $48,457 for run service

(totaling $75,222.00), as per SOW Schedule 4A.

38.    Fourth, as set forth above, InnerWorkings owes the remaining amortized transition charges incurred by Capgemini in 2015 but not yet paid by InnerWorkings (SOW Schedule 4 at § 14 and SOW Schedule 4A at pp. 5-6), as follows:

| | |
|---|---|
| April 15-30 2016 | $26,765 |
| May 2016 | 53,530 |
| June 2016 | 53,530 |
| July 2016 | 53,530 |
| August 2016 | 53,530 |
| September 2016 | 53,530 |
| October 2016 | 53,530 |
| November 2016 | 53,530 |
| December 2016 | 53,530 |
| Total | $455,005 |

39.    Significantly, InnerWorkings owes Capgemini all of the transition charges enumerated above regardless of its reasons for its purported termination of the Agreement.  In particular, SOW Schedule 4 provides that "[i]n the event of the termination of the Agreement for any reason (other than partial termination of the agreement), Customer will pay in full to Capgemini upon the effective date of termination all remaining unbilled Transition Charges payable under SOW 1, in addition to the Termination Charges listed in Attachment 4A (Charges Workbook), as they may apply" (SOW Schedule 4 § 14(b) (emphasis added)).

40.    Fifth, InnerWorkings owes Termination Charges due and owing under Schedule 4A of the SOW.   In particular, because InnerWorkings has no right to terminate for material breach and failed to provide the contractually-required written notice and opportunity to cure, InnerWorkings' termination of the Agreement must be deemed a termination for convenience as of October 1, 2016.  Accordingly, pursuant to MSA § 4.3 and SOW Schedule 4 at § 14(a), InnerWorkings must pay the Termination Charge of $569,003 set forth at SOW Schedule 4A at p. 24.

41.     Sixth, InnerWorkings owes the remaining "run" charges (less costs saved due to April 15, 2016 termination) due and owing under Schedule 4A of the SOW.     In particular, because InnerWorkings has no right to terminate for material breach and failed to provide the contractually-required written notice and opportunity to cure, InnerWorkings' termination of the Agreement must be deemed a termination for convenience as of October 1, 2016.  Accordingly, pursuant to the Agreement and SOW Schedule 4 at § 14(a), InnerWorkings must pay all amounts it would have paid had the Agreement terminated effective October 1, 2016.  Hence, InnerWorkings owes the remaining "run" charges (less any cost mitigation) (the "Remaining Run Charges"):

| | |
|---|---|
| April 15-30 2016 | $ 48,457 |
| May 2016 | 119,777 |
| June 2016 | 123,280 |
| July 2016 | 123,280 |
| August 2016 | 123,280 |
| September 2016 | 123,280 |
| Total | $661,354 |

42.     Thus, in sum, the following amounts are due and owing from InnerWorkings to Capgemini:

| | |
|---|---|
| Outstanding Invoices | $ 453,849.55 |
| March Invoices | 149,283.00 |
| April First-Half Invoices | 75,222.00 |
| Remaining Transition Charges | 455,005.00 |
| Termination Charges | 569,003.00 |
| Remaining Run Charges | 661,354.00 |
| Total | $2,363,716.50 |

## FIRST CAUSE OF ACTION

### (Breach of Contract)

43.     Capgemini repeats and realleges each and every allegation set forth above, as if set forth fully herein.

44.     As set forth above, Capgemini and InnerWorkings entered into the

Agreement, including the MSA and SOW.

45.     The Agreement is a valid and binding contract between Capgemini and InnerWorkings.

46.     As set forth above, InnerWorkings breached the Agreement with Capgemini, including but not limited to the MSA and SOW, by improperly purporting to terminate the Agreement without any legal right to do so, and by repudiating and/or refusing to honor its obligations thereunder, including its obligation to pay Capgemini fees due.

47.     Capgemini at all relevant times substantially performed its obligations under the Agreement.

48.     InnerWorkings has repudiated its obligation to comply with the dispute resolution provisions of the MSA, and/or such provisions have been performed and/or exhausted.

49.     Accordingly, as a consequence of the foregoing, Capgemini has suffered damages in an amount to be determined at trial, but believed to be approximately $2,363,716.50, plus interest and costs of collection, including reasonable attorneys' fees to the extent allowable by law.

## SECOND CAUSE OF ACTION

### (Unjust Enrichment, in the Alternative)

50.     Capgemini repeats and realleges each and every allegation set forth above, as if fully set forth herein.

51.     InnerWorkings' receipt and retention of the services provided by Capgemini and the amounts due therefore, without paying Capgemini the amount due of not less than $1,133,359.50 (consisting of all unpaid amortized transition charges incurred in 2015 plus all unpaid run charges through April 15, 2016), has conferred an unearned and undeserved benefit upon InnerWorkings, allowing InnerWorkings to enrich itself unjustly and at the expense

of Capgemini.    It violates the principles of justice, equity and good conscience for

InnerWorkings to retain such sums and/or benefits without compensation to Capgemini.

52.    Accordingly, as a consequence of the foregoing, Capgemini has been

damaged in an amount to be determined at trial, but not less than $1,133,359.50, plus interest and

costs of collection, including reasonable attorneys' fees to the extent allowable by law.

WHEREFORE, Capgemini demands judgment as follows:

(i)    On the First Cause of Action, awarding Capgemini damages in an amount to be determined at trial, but believed to be approximately $2,363,716.50 plus interest and costs of collection, including attorneys' fees to the extent allowable by law;

(ii)    On the Second Cause of Action, awarding Capgemini damages in an amount to be determined at trial, but not less than $1,133,359.50, plus interest and costs of collection, including attorneys' fees to the extent allowable by law, and

(iii)    For such other and further relief as the Court deems just and proper.

Dated: March 28, 2016

Respectfully submitted,

**CAPGEMINI AMERICA, INC.**

By: /s/ Cheryl Tama Oblander
    One of Its Attorneys

Cheryl Tama Oblander, Esq. (ARDC # 6199464)
ARONBERG GOLDGEHN
330 North Wabash Avenue, Suite 1700
Chicago, Illinois 60611-3586
Phone: (312) 755-3189
Fax: (312) 828-9635
ctama@agdglaw.com

OF COUNSEL:

Gerry Silver, Esq. (New York State Bar No. 2392686)
(Moving for Pro Hac Vice Admission)
SULLIVAN & WORCESTER LLP
1633 Broadway
New York, NY  10019
Phone: (212) 660-3096
Fax: (212) 660-3001
gerry.silver@sandw.com